KOOLVENT METAL AWNING CORPORATION of America, Plaintiff,

v.

KOOL–VENT METAL AWNING CORPORATION OF MISSOURI, Aluma-Kraft Manufacturing Company, Midwest Kool-Vent Aluminum Awning Company, Inc., and Theodore J. Bottom, Defendants.

No. 9523(2).

United States District Court, E. D. Missouri, E. D.

Feb. 14, 1955.

Kingsland, Rogers & Ezell, Edmund C. Rogers and Estill E. Ezell, St. Louis, Mo., for plaintiff.

Terry & Cohn, and Lawrence H. Cohn St. Louis, Mo., for defendants.

HULEN, District Judge.

In this case plaintiff charges defendants with infringement of two patents and a common law trade-mark and seeks injunctive relief and accounting. As to the patents, the prime issue is infringement and validity. The title of plaintiff in the trade-mark is challenged. By counterclaim defendants request an adjudication that they are the owners in Missouri of the trade-mark in issue. Defendants claim a bar of assertion of title by plaintiff, if any, by estoppel and unclean hands.

This case is between the same parties and a sequel to Koolvent Metal Awning Corp. of America v. Bottom, 8 Cir., 205 F. 209. Underlying facts are recited in that opinion.

## I.

(A) Claims 16, 17 and 18 of the Houseman reissue patent (No. 20,975) are at issue on a charge by plaintiff of infringement. The Houseman patent covers a metal awning. An awning substantially like the structure shown in the Houseman patent is the foundation of plaintiff's business.

Claims 16, 17 and 18 relate to the side louvers of the awning. These louvers consist of a number of vertical metal plates or slats. By their arrangement they offer protection against sun and rain but admit light and air.

The claims read:

"16. An awning adapted to be fastened to a wall or the like support, including a curtain comprising a series of spaced overlapping parallel vertical depending plates, angling outwardly from the awning toward the wall at not more than ninety degrees.

"17. The device as claimed in claim 16 wherein the said vertical plates are provided with roof extensions adapted to join to the main roof of the awning.

"18. The device as claimed in claim 16, wherein the said vertical plates are provided with roof extensions adapted to join to the main roof of the awning."

Defendants present a number of old patents in support of their prior art defense, none of which were considered by the Patent Office in allowing claims 16, 17 and 18.

Examining the drawing of the Houseman patent (Plaintiff's Exhibit No. 1) we see a set of side louvers, created by a series of plates or metal strips of undeclared width. The louver effect is secured by arranging the plates at an angle, outwardly from the awning toward the wall. It can be seriously argued that the creation of louvers in this manner and for like purpose is a very old device. Many houses in the early nineties had windows equipped with shutters using the same principle.

The object of the Houseman device is stated—

" * * * offering protection against sun and rain or snow, will at the same time admit air and light."

The louvers of the window shutter were horizontal. They were adjustable. Their purpose parallels the object of the Houseman louver, in "offering protection against sun and rain." They did admit air and could be adjusted to admit more or less light.

Take a step further and let the object of the Houseman patent bear on the old Frantz patent (No. 878,284, April 8, 1907) which reads:

"The numeral 1 designates the awning frame which may be of any desired construction and covered with either a fabric or metal, and is here *shown as formed of a series of blind slats 2 which prevent the entrance of sun and rain under ordi-*nary conditions and yet allow ventilation or the passage of air therethrough."

Or let the Bauschard patent (No. 1,926,609, June 29, 1932) object bear on the Houseman purpose. It reads:

"The vertical area of the side walls may be, and preferably is, formed to provide ventilating and light-admission openings in the form of the usual louver construction, indicated at 15 in Figures 9 and 10. This louver construction, in addition to stiffening the side walls, permits the escape of heated air which may be trapped beneath the awning proper and reduces the darkening effect of the awning by admitting light. Of course the louver openings extend toward the structure to which the awning is secured to prevent the admission of rain or the like as far as possible."

Note the language of this description as to the side of the awning—"in the form of the usual louver". (See 15 on Bauschard drawing and compare with 26–26A of Houseman drawing.)

Plaintiff presents the essence of Claim 16 of the Houseman patent:

"(1) An awning adapted to be fastened to a wall or the like support, including

"(2) a curtain comprising a series of

"(3) spaced

"(4) overlapping

"(5) parallel

"(6) vertical

"(7) depending

"(8) plates,

"(9) angling outwardly from the awning toward the wall at not more than ninety degrees."

These terms could well be used to describe the Bauschard device. The Houseman patent starts with "a series" of "plates" which, when assembled, accomplish the same result in the same way as the Bauschard structure.

There is no invention in the mere turn of a "flange" on the edge of the plates to divert the water which falls against the plate, as set out in Claim 17. Claim 18 is in the same class as Claim 17. The "roof extension" is a simple bend in the plates to a degree, to meet the "main roof." We feel it is suggested by the Bauschard structure at the top of the louver.

Taking the three claims we cannot escape the conclusion that they accomplish—

"substantially the same result by substantially the same means and by substantially the same method of operation."

as do the prior art, particularly the Bauschard patent.

■ We have here a combination or assembly of old elements, of old ideas. Their combination can only represent what a skilled mechanic, given the old art, could devise and construct. Invention is lacking. If this be "by the rather severe test," we are guided by what the Supreme Court said in Great A. & P. Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 151–153, 71 S.Ct. 127, 130, 95 L.Ed. 162:

" 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' * * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics.

* * * * * *

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

The louvers in the Houseman patent are larger and extend out farther than in the Bauschard patent. This evidences mechanical skill in their construction. We find no indication of spark of inventive genius. They still are there for and accomplishing the same purpose and in the same manner as louvers have always been used. The arrangement of the "plates" to effect their object, by placing them at an angle, is "the usual" and time-worn form.

■ Although the Houseman patent has expired since this suit was filed, we hold it was without force in so far as Claims 16, 17 and 18 might bear on the accused structure of the defendant, prior to expiration.

(B) If Claims 16, 17 and 18 of the Houseman patent were not invalid for the reasons assigned, then there is presented a serious question of infringement in the accused structure.

The Houseman patent repeatedly refers to the side louvers or plates as "overlapping," and that such overlapping keeps out "all direct rays of the sun." The examiner was critical on this function of the Houseman patent. And again the applicant stressed that the arrangement of the plates would stop all "direct rays of light," because of the overlapping.

The drawing plainly shows overlapping of plates in the Houseman structure.

It is unchallenged that the accused structure does not have overlapping plates representing the side louvers and that defendants' structure does not interpose itself between direct sunlight or weather if it reaches the awning from a certain angle. There is a 1½ inch space between the plates on the defendants' awning. That 1½ inch space does admit unimpeded a ray of sunlight or weather to that extent if directed at the awning from right angles from the plates or louvers.

How shall the plaintiff's claim of infringement be construed—how liberal shall we construe Claims 16, 17 and 18?

When the Houseman claim was pending before the examiner, the following proceeding took place as shown by the file wrapper (Defendants' Exhibit VV, pp. 22–23):

"Claims 16, 17 are rejected on the ground of lack of invention to make the awning curtain of the same kind of material as compose the roof part as taught by any wellknown awning having triangular end pieces.

"Claim 18 is rejected as confused in "to angle outwardly" lines 2, 3.

"Claims 16–19 directed to the curtain are rejected as contrary to applicant's oath, page 2, lines 2 and 7 thereof, relating to direct rays of light. It is evident that awning according to the oath is to shut off direct rays from the sun while the curtain being a part of the awning admits such direct rays."

The patentee filed his argument in answer to such disallowance. It recites (p. 27):

"Claim 16 has been amended so that now it, as well as dependent claims 17, 18 and 19, in the absence of art, are clearly allowable, and the examiner is requested to allow the same.

"Applicant takes issue with the Examiner's last paragraph of his action, and feels that the Examiner is entertaining a wrong idea as to the meaning of a awning as generally understood. Many types of awnings have no side curtains at all.

"Applicant's oath, page 2, line 2 to 7, goes into detail somewhat in speaking about cutting out the direct rays of light "through the roof of an awning". Applicant also wants to call the Examiner's attention to that where the plates of the curtain angle outwardly toward a wall or the like, no direct rays of light could come through the side curtains at all as the direct rays of light would be coming from a direction opposite the wall, or perpendicular to the side of the awning. In both of which cases the direct rays of light would be entirely stopped by the plates 11."

We believe this Court's rule of construction of plaintiff's position on its Claims 16, 17 and 18 is directed by the Supreme Court in Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, loc. cit. 220–221, 61 S.Ct. 235, 239, 85 L.Ed. 132:

"It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent. Shepard v. Carrigan, 116 U.S. 593, 6 S.Ct. 493, 29 L.Ed. 723; Sutter v. Robinson, 119 U.S. 530, 7 S.Ct. 376, 30 L.Ed. 492; Roemer v. Peddie, 132 U.S. 313, 10 S.Ct. 98, 33 L.Ed. 382; Phoenix Caster Co. v. Spiegel, 133 U.S. 360, 10 S.Ct. 409, 33 L.Ed. 663; Hubbell v. United States, 179 U.S. 77, 21 S.Ct. 24, 45 L.Ed. 95; Weber Electric Co. v. E. H. Freeman Electric Co., 256 U.S. 668, 41 S.Ct. 600, 65 L.Ed. 1162; I.T.S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 443, 47 S. Ct. 136, 141, 71 L.Ed. 335. The patentee may not by resort to the doctrine of equivalents, give to an allowed claim a scope which it might

have had without the amendments, the cancellation of which amounts to a disclaimer. Smith v. Magic City Club, 282 U.S. 784, 790, 51 S. Ct. 291, 293, 75 L.Ed. 707; Weber Electric Co. v. E. H. Freeman Electric Co., supra, 256 U.S. 677, 678, 41 S.Ct. 603, 65 L.Ed. 1162; I.T.S. Rubber Co. v. Essex Rubber Co., supra, 272 U.S. 444, 47 S.Ct. 141, 71 L.Ed. 335. The injurious consequences to the public and to inventors and patent applicants if patentees were thus permitted to revive cancelled or rejected claims and restore them to their patents are manifest. See Leggett v. Avery, 101 U.S. 256, 259, 25 L.Ed. 865.

"True, the rule is most frequently invoked when the original and cancelled claim is broader than that allowed, but the rule and the reason for it are the same if the cancelled or rejected claim be narrower. Morgan Envelope Co. v. Albany Paper Co., 152 U.S. 425, 429, 14 S.Ct. 627, 629, 38 L.Ed. 500; Wm. B. Scaife & Sons Co. v. Falls City Woolen Mills, 6 Cir., 209 F. 210, 213; see Computing Scale Co. v. Automatic Scale Co., 204 U.S. 609, 620, 621, 27 S.Ct. 307, 311, 312, 51 L.Ed. 645; cf. in case of disclaimer Altoona Publix Theatres, Inc. v. Tri-Ergon Corp., 294 U.S. 477, 492, 493, 55 S.Ct. 455, 461, 462, 79 L.Ed. 1005."

■■■ That which the patentee was particular to restrict before the examiner, and on the basis of which restriction a patent was issued, plaintiff would now depart from and enlarge. If we are to allow a deviation of 1½ inches in this case as an equivalent, plaintiff could just as reasonably enjoin as infringement any other like or similar construction regardless of space between louvers or plates. Plaintiff placed its own interpretation on its claims before the Patent Office. On that interpretation a patent was issued. Plaintiff should be held to its Patent Office representation. We find defendants' structure does not infringe Claims 16, 17 and 18.

## II.

(A) Claim 11 of the Harrison patent (No. 2,562,092) is in issue on charge of infringement. It is concerned with the top of the awning.

Claim 11 reads, in substance, and as analyzed by plaintiff:

"(1) An awning construction which comprises

"(2) a series of spaced lower channels

"(3) having upwardly turned flanges,

"(4) a staggered series of upper channels

"(5) having their webs mounted over the spaces between the first series of channels

"(6) with downwardly-turned side flanges,

"(7) the free edges of which have laterally inturned lips that form ledges substantially parallel with the webs of the channels on which they are carried,

"(8) and of a width several times the thickness of the metal from which the channels are formed,

"(9) and elements

"(10) mounted wholly between the overlapping web portions of the upper and lower channels

"(11) and secured to and carried by the lower channels adjacent the flanges of the lower channels,

"(12) said elements extending into the space between the ledges and webs of the upper channels

"(13) and having faces under which the ledges formed by the lips of the upper channels are locked

"(14) whereby the upper channels are locked against upward movement

"(15) and restrained against sidewise movement."

Plaintiff admits "there are differences in the way the Harrison patent embodies the snap-on construction and the way the accused awning embodies the snap-on construction," but claims there

are "important common denominators" between the two awnings and that the issue is whether the "common denominator" is patentable.

We do not view the issue as thus presented.

When the differences in object of the use of the structures and manner of securing it, of the two devices, plaintiff's and defendants', are pressed to their proper place on this record, we find they embody the prime issue.

Plaintiff's patent is a combination patent, including in part at least some old art. The first ten elements of Claim 11 of the Harrison patent relates to the channel members. They are simple, involving elementary bends of the metal to make a top member fit over a bottom member. In themselves and standing alone we doubt if any one would assert they were patentable as of 1951. (See Gibbons English patent of 1884, Defendants' Exhibit ZZ.)

It is the remainder of the elements (11 to 15) that constitutes the crux of the issue between the parties—the means of securing the upper channels and lower channels, the relation between the two when secured in place and the object of such relation.

The upper and lower channels or pans, on top of the awning frame, are held in place by means of two or more "elements," the number of elements varying with length of awning or channels. It is more realistic to here use the word "posts" instead of "elements," because that is what they are. While the "claim" uses the word "element," the description of the patent uses the word "bolt" and the object of the "element" can leave little doubt but that "element" means some character of post or "bolt." We refer to the drawing of the patent and particularly figure 4 and the description referring to this drawing:

"Our invention may be more fully understood by reference to the accompanying drawings, in which:

\* \* \* \* \* \*

"They are also supported by transversely extending parallel cross channels of light section, these cross members being designated 5. They are secured to the channels by means of bolts 6 that pass through one of the horizontal flanges of the cross channels 5, and through the webs of the channel members 2, \* \* \* The screws 6 pass through the pans near the side flanges 3, and as clearly shown in Fig. 4, they are threaded into the lower ends of tubular posts 7, which may be either metal or plastic. These posts, which are preferably, but not necessarily cylindrical, have grooves 8 in the peripheries thereof, the grooves being at or near the level of the top of the flanges 3 of the pans.

"\* \* \* According to the present invention the depending lower edges of the flanges 10 are turned inwardly, the inwardly turned portions being designated 11. The inwardly turned portions 11 are received in the grooves 8 of the posts 7 and the posts 7 are of a height such as to maintain the proper spacing between the flat portions of the webs and covers. \* \* \*" (Emphasis added.)

"The claims of a patent are always to be read or interpreted in the light of its specifications". Schriber-Schroth Co. v. Cleveland Trust Co., supra, 311 U.S. loc. cit. 217, 61 S.Ct. loc. cit. 238.

Plaintiff would free itself from the effects of the description and its structure "most clearly shown in Figures 2, 3 and 4" of the patent, on the meaning to be given to the term "element." Plaintiff's brief recites:

"While the 'elements' of element 9 of the claim are illustrated as posts in the Harrison patent, please note that the term 'elements' is used to connote a broader meaning than merely the illustrated posts. There is nothing in the word 'elements' that requires that the elements be in the shape of posts.

\* \* \* \* \* \*

"Thus, the claim itself defines the structure and position of the 'elements' in language that by no means requires those elements to be posts. This, of course, is the typical practice in patent law by which an inventor may express an invention more broadly than the particular illustration given in his drawings."

But any reasonable interpretation of plaintiff's patent would lead one to believe that the "elements" holding the top pans would and must be some kind of a post whether it be round or square or oblong. How else can the descriptive purposes be achieved? The space laterally between the post, bolt, or "element," that is below and above must be left open to the greatest extent permissible by good construction. This can only be done by using a bolt or similar construction. This construction is necessary to carry out one of the declared main features of the patent—to admit air in and out from under the awning. We quote from the description of the patent—

"They are in vertical spaced relation to the pans so that air immediately under the awning which is warmed by contact with the awning surface may escape to some extent from under the awning."

We pass to defendants' patent. Does it accomplish substantially the same result, by substantially the same means operating together in substantially the same way?

Plaintiff's patented structure presents a ventilated awning as one of its prime objects. Defendants' does not. The roof pans on the accused structure are clamped together and no air can escape in defendants' device. Substantially the same result is not accomplished by the two devices.

To secure the ventilating result the "element" or bolt is a prime feature of plaintiff's device. Defendants use no "element," the upper and lower pans being snapped together for their entire length.

Plaintiff uses a third element to hold the upper and lower pan, the "element" or bolt. Defendant does not.

Substantially the same means are not present in the two structures.

If the term "element" in Claim 11 were given such a broad meaning as to read on defendants' structure, then Gibbons prior art patent would read on plaintiff's Claim 11, as would the Flatau patent (No. 537,569, April 16, 1895; Defendants' Ex. No. YY) render the plaintiff's claims void. See also the Drake patent of 1898, the Hooper patent of 1898. The Perrusi patent plainly suggests the defendants' structure. Such a construction would further make plaintiff's patent subject to a claim of invalidity for overclaiming the invention.

(B) Admittedly the Harrison patent has never been built into a commercial awning. This fact does not serve the plaintiff's attempt to widen the patent coverage nor suggest a liberal construction be given the claims.

The parties are engaged in a crowded field. The art, if such it still is, is crowded. Having failed to use the patent, what is the impact on plaintiff's position of asking this Court to broaden its scope? See American Laundry Mach. Co. v. Strike, 10 Cir., 103 F.2d 453. We quote 103 F.2d loc. cit. 457:

"As stated, claims 5 and 6 are textually limited to spring actuated toggle means, while the broader claims 2, 3, and 8 do not specify or describe the means. But the specifications make repeated reference to spring actuated toggle means. There is little room for doubt that spring means were contemplated in all of the claims. [Just as a post was contemplated in the Harrison patent.] Further, if claims 2, 3, and 8 be construed as broad enough to embrace every means [as plaintiff here asserts] normally tending to move the manuals from intermediate position to inoperative position, and to maintain them in full operative position they are functional and void

for indefiniteness and uncertainty. Jensen-Salsbery Laboratories v. O. M. Franklin Blackleg Serum Co., supra [10 Cir., 72 F.2d 15]; Callison v. Pickens, supra [10 Cir., 77 F.2d 62]. In addition, plaintiff manufactured and sold approximately 2,000 pressing machines intermediate the issuance of this patent and the trial of the case, not one of which complied in all respects with the patent. In other words, this is a paper patent in a crowded art, not used by its owner engaged on a large scale in the manufacture and sale of such machines. It is well settled that a nonused patent positioned in a crowded art should not be aided by a broad interpretation of the claims."

■ We find no infringement of the Harrison patent in the accused structure, as complained of.

### III.

The issue of trade-mark infringement on "Koolvent" presents a serious and troublesome question. It was alluded to in the former trial. Had it there been presented and settled it would have served the parties better than we now can.

We go to defendants' plea of estoppel.

Defendant Bottom made two contracts with plaintiff in 1947. The first contract restricted use of the patent licensed to the City of St. Louis and certain adjoining counties. The second license, substantially like the first, broadened the territory to include the balance of the Missouri counties to the Kansas line and certain counties in Kansas.

These contracts are described in the former suit. It is sufficient for the present purpose we reiterate that plaintiff, having a contract with the patentee so to do, licensed defendant Bottom to make the awning covered by the patent, with the understanding Bottom would form a corporation and assign the contracts.

In the following respects the contracts are identical:

"6. Unless otherwise terminated in accordance with the provisions of this agreement, the license herein granted shall extend to the full end of the term for the last patent for the LICENSED INVENTIONS, no royalty shall be payable for the use of such expired patent, but if the article or articles manufactured by THE LICENSEE shall embody the invention of both an expired and an unexpired patent, the royalty set forth shall continue to be paid by THE LICENSEE until the expiration of such other patent or patents.

\* \* \* \* \* \*

"15. LICENSEE agrees that it will apply the proper patent notice to the articles manufactured by it under the LICENSED INVENTIONS, and that it will not use the trade name 'KOOL-VENT' on any products not made under this license.

\* \* \* \* \* \*

"18. The LICENSEE shall have the right to use the words 'KOOL-VENT METAL AWNING', singly or in combination in any corporation name or trade mark which he may adopt for the purpose of carrying out the rights set forth in this contract, but only on products made under this license and agreement."

Nowhere in the contract does plaintiff claim to own the trade-mark "Kool-Vent," except as its (plaintiff's) name may carry some significance.

It is obvious, although not expressly stated in the contract, that use by the defendant Bottom and his assignees of the name "Kool-Vent" was understood and approved by plaintiff at the time the contracts were entered into. But use of the name was limited by the contract—it was under restrictions (1) that it would only be used on the licensed product, or (2) *"in any corporation name or trademark which he may adopt* for the purpose of carrying our the rights" set forth in the contract.

Defendants adopted the trade-mark "Kool-Vent" to apply to the awning made under the license agreement and used it in a name of a corporation that made and

sold the licensed product. We say this must have been understood because it was done long prior to cancellation of the contracts, with plaintiff's knowledge and without objection from plaintiff.

We hold it is further a fair and reasonable construction of the contract that if it were to run its course defendants could thereafter use the trade name "Kool-Vent." This is evident from paragraphs 6 and 15. Paragraph 6 authorizes the manufacture of the awnings covered by the license, after expiration of the patents, without royalty or cost or condition of any kind, and paragraph 15 permits use of the trade-mark on products "made under this license" agreement. The contract is silent as to restriction on use of the trade name in defendant's corporate name after the expiration of the contract.

Now the question is—were the conditions under which the contract was cancelled such as to make it inequitable to apply any rule on use of the trade name other than that which would have applied had the contract run its course.

In the previous litigation we found that in seeking to enforce the license agreement with defendants plaintiff came into the court on equitable claims with unclean hands. In passing on assignment of this finding as error the Court of Appeals said in Koolvent Metal Awning Corp. v. Bottom, 205 F.2d 209, 215:

"We think the inferences thus drawn by the court were clearly warranted by the proven and admitted facts. It is to be noted too in this connection that the court by one of its findings states, 'Plaintiff contracted by the Matthews settlement to carry the ethics of the market place into the court room and have a lawyer state to the Court that he is not only withdrawing as attorney in the case but, of more serious import, represent to the court that the cause he has theretofore represented is without merit. And without prior notice or knowledge on the part of the lawyer's record client, the defendants, that is exactly what the lawyer for plaintiff did.' The conclusion that plaintiff comes into court with unclean hands is, we think, amply supported by the evidence. Having come into court with unclean hands, it had no standing in a court of equity and the other contentions made by plaintiff are therefore immaterial to a decision of this case."

Defendants, having originated use of the name "Kool-Vent" in Missouri under agreement with plaintiff, were unable to keep that contract through no fault of their own, but by virtue of conduct of plaintiff, and conduct by which plaintiff profited to defendants' loss, all in violation of its contract with defendants.

"The contracts as originally executed authorized defendants to construct the Kool Vent awnings as supposedly authorized under the Houseman patent. Defendants, however, were enjoined by the holders of the Matthews patent from continuing operations under the original license contracts. This injunction was in full force and effect at the time of the trial of this suit and it had been procured with the assistance of the plaintiff. Manifestly, the court could not have decreed the enforcement of the contracts under these circumstances. Again, these contracts had been breached by the plaintiff for its failure to defend against infringement and for its failure to grant defendants the advantages which it acquired under its contract of settlement with the holders of the Matthews patent."

■ Certain conclusions force themselves upon us. It was contemplated by the parties to the licensing agreements that defendants would use the name "Kool-Vent" in Missouri in manufacturing awnings under the license agreements, and when the patent covered by the license expired defendants would be free to continue their manufacture without any restriction on use of the name

"Kool-Vent." That the license relation between the parties did not continue until the expiration of the Houseman patent was through no fault of defendants, but the acts of plaintiff described above. If plaintiff was without equitable grounds to enforce the license agreements with defendants it follows, and for like reasons, that plaintiff is not in a position to take from defendants in Missouri the right to use the trade name that originated in the license agreements. Patently if as a part of the original suit between these parties plaintiff had sought the trade-mark relief now asked it would not have been granted. Plaintiff did not improve its position by delay. The record has been written, written by plaintiff and at its own volition. Time cannot change it.

## IV.

Defendants by counterclaim filed January 29, 1954, ask for a decree—

"* * * declaring defendants to have the exclusive rights in the State of Missouri for the name and mark KOOL VENT as applied to awnings and kindred products; that plaintiff and those acting for or associated with plaintiff be enjoined from selling or offering for sale in this State any awning or kindred product designated a KOOL VENT awning * * *"

Paragraph 32 of the answer reads:

"Plaintiff, with full knowledge of the valuable reputation and good will of KOOL VENT OF MISSOURI in its trade-mark and trade name, did wrongfully, and with intent to injure the said defendant, and to mislead and deceive the public, induce other persons to establish a business under the name St. Louis Koolvent Metal Awning Corporation in St. Louis, Missouri, and to advertise and sell Kool Vent awnings, all in violation of defendants property rights in its name, marks, good will and reputation and to defendants damage, and plaintiff threatens to induce others to violate defendants said rights."

In April 1952 Kool Vent Awning Corporation of Missouri filed a suit in the State Court in St. Louis, Missouri, against St. Louis Kool Vent Metal Awning Corporation and Harold Halpern. We take the following from the petition in that case:

"4. In April 1946 plaintiff's predecessor, KOOL VENT METAL AWNING CORPORATION OF MISSOURI, began the business of manufacturing, selling and installing metal awnings, and began using the name KOOL VENT as a trade mark on and in connection with the sale of its said awnings, in the State of Missouri.

"5. Plaintiff's said predecessor continued the said business until about September 30, 1949 at which time it changed its name to ALUMA KRAFT MANUFACTURING COMPANY, and on or about the same date it caused plaintiff to be incorporated under its old name, and transferred to plaintiff its business, trade-mark rights, and good will in connection with the selling and installing of KOOL VENT awnings.

"6. The total sales of KOOL VENT awnings by plaintiff and its predecessor have exceeded the sum of $1,700,000.00, and moneys expended for advertising the said awnings have exceeded the sum of $88,000.00.

"7. By reason of the long continued use and extensive advertising and sales the names KOOL VENT METAL AWNING CORPORATION OF MISSOURI, and KOOL VENT, and any names similar thereto, mean and are understood to mean to the trade and public in the City of St. Louis and State of Missouri, only plaintiff and the awnings sold by plaintiff.

\* \* \* \* \* \*

"11. * * * defendants' organizers and owners, including the defendant Halpern, did, on or about September 20, 1951, cause the de-

fendant corporation to be formed and incorporated under and with the name ST. LOUIS KOOL VENT METAL AWNING CORPORATION, and thereafter did, on or about March 1, 1952, under the said name, commence advertising and selling metal awnings denominated KOOL VENT awnings in the City of St. Louis and State of Missouri.

\* \* \* \* \* \*

"WHEREFORE, plaintiff prays that defendant

"1. ST. LOUIS KOOL VENT METAL AWNING CORPORATION, its officers, employees and agents, and defendant HAROLD HALPERN, and all those acting by or under authority from defendants, be temporarily and perpetually enjoined and restrained from using the name ST. LOUIS KOOL VENT METAL AWNING CORPORATION, or any other name which is confusingly similar to plaintiff's corporate name, and from selling or offering for sale in the State of Missouri, awnings which are designated or identified by the trade mark KOOL VENT;"

\* \* \* \* \* \*

The plaintiff in this case tried to intervene in the State court action but on objection the request was denied. However its attorneys defended the suit. It has been tried and is under submission. The record is an exhibit in this case. Suffice to say the history of the relations between plaintiff and defendants is in the record of the State case, defendants there claiming:

"Plaintiff comes into Court with unclean hands for the reasons that it is claiming relief under State of Missouri trade mark registrations that were fraudulently obtained as hereinbefore set forth, and for further reason that plaintiff's present use of the name KOOL VENT is a part and culmination of an Illegal scheme and plan by Aluma Kraft and plaintiff to defraud defendants and Kool Vent of America of their right to use the trade name KOOL VENT, said scheme including the surreptitious registration of the trade marks, Certificates No. 14,-436 and No. 14,437 and subsequent acts which were intended to and did lull Kool Vent of America while Aluma Kraft was ostensibly proceeding and complying with the requirements of the license agreement of Exhibit A, but was actually acting to defraud Kool Vent of America of rights in the name KOOL VENT and to damage Kool Vent of America by this fraudulent scheme and misappropriation of the name KOOL VENT in derogation of said license agreement.

"Plaintiff further comes into Court with unclean hands because plaintiff and Aluma Kraft have schemed to damage, and have damaged, defendants in that they have employed an illegal and unauthorized plan to sell, both here and elsewhere, awnings under the name KOOL VENT, and other awnings under the name Aluma Kraft, at least some of which latter awnings are identical with those sold under the name KOOL VENT; all for the purpose of confusing the purchasing public, and destroying the good will and reputation of KOOL VENT awnings, both here and elsewhere. And in furtherance of said scheme and actions, plaintiff and Aluma Kraft have, both in Missouri and elsewhere, represented, advertised and promoted sales of Aluma Kraft awnings as being identical with KOOL VENT awnings, and have represented to Aluma Kraft customers and prospective customers that Aluma Kraft awnings are made by the same company that makes KOOL VENT awnings, for the purpose of selling Aluma Kraft awnings and defeating the proper and authorized sales of Kool Vent awnings."

Defendant Kool Vent of Missouri, having chosen the State tribunal to test its right to the ownership of the

trade-mark "Kool Vent," and seeking broad injunctive relief that could go to this plaintiff, and having tried its case in the State court, and that court now having the case under submission, we conclude that for this court to now, in this case, entertain jurisdiction would be to oust the State court of its prior jurisdiction in a controversy where each court does have original jurisdiction. We decline to meddle. See Harkrader v. Wadley, 172 U.S. 148, 149, 19 S.Ct. 119, 125, 43 L.Ed. 399, 404:

"When a state court and a court of the United States may each take jurisdiction of a matter, the tribunal where jurisdiction first attaches holds it, to the exclusion of the other, until its duty is fully performed and the jurisdiction involved is exhausted; and this rule applies alike in both civil and criminal cases."

Let decree in accord with this memorandum be settled and submitted.